## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DARRYL PERRY**, | : | **CIVIL NO. 1:18-CV-870** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **DAVID J. EBBERT**, *et al.*, | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

Plaintiff Darryl Perry ("Perry"), an inmate confined at the Federal Prison Camp in Lewisburg, Pennsylvania ("FPC-Lewisburg"), commenced this <u>Bivens</u>[1] action on April 23, 2018. (Doc. 1). Named as defendants are Warden David J. Ebbert, Dr. Andrew Edinger, and Dr. Christopher Lee. (<u>Id.</u>) Perry alleges that defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment by denying his request for a transfer to a facility that has an air-conditioned housing for its Residential Drug Abuse Treatment Program ("RDAP") participants.[2] (<u>Id.</u>)

---

[1] <u>Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics</u>, 403 U.S. 388 (1971). <u>Bivens</u> stands for the proposition that "a citizen suffering a compensable injury to a constitutionally protected interest could invoke the general federal-question jurisdiction of the district courts to obtain an award of monetary damages against the responsible federal official." <u>Butz v. Economou</u>, 438 U.S. 478, 504 (1978).

[2] The RDAP is one of the drug abuse treatment programs offered to inmates by the Federal Bureau of Prisons ("BOP"). 28 C.F.R. § 550.53.

Presently ripe for disposition is a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment pursuant to Federal Rule of Civil Procedure 56 by defendants Ebbert and Edinger.  (Doc. 11). For the reasons set forth below, the court will grant defendants' motion for summary judgment.[3]  The court will also dismiss the action against defendant Christopher Lee pursuant to Rule 4(m) of the Federal Rules of Civil Procedure.

## I.    Legal Standard

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact" and for which a jury trial would be an empty and unnecessary formality.  See FED. R. CIV. P. 56(a), (c).  The burden of proof is upon the nonmoving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the nonmoving party on the claims.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89

---

[3] Because defendants rely on documents outside the pleadings to support their arguments, the court will address the arguments under the summary judgment standard.  Furthermore, with respect to exhaustion of administrative remedies, by order dated February 19, 2019, the court placed the parties on notice that it may consider exhaustion in its role as fact finder under Small v. Camden County, 728 F.3d 265 (3d Cir. 2013).  (Doc. 24) (citing Paladino v. Newsome, 885 F.3d 203 (3d Cir. 2018)).  The order also afforded the parties the opportunity to supplement the record with any additional evidence relevant to exhaustion of administrative remedies.  (Id.)

(1986); see also FED. R. CIV. P. 56(c), (e).  Only if this threshold is met may the cause of action proceed.  Pappas, 331 Supp. 2d at 315.

## II.  Statement of Material Facts[4]

### A.  Exhaustion of Administrative Remedies

A search of the BOP's computerized record was conducted to determine all administrative remedies that Perry submitted from the date he entered federal custody through May 18, 2018.  (Doc. 15, Statement of Material Facts, ¶ 9; Doc. 16, Ex. 1, Declaration of Jennifer Knepper ("Knepper Decl."), ¶ 6; Doc. 16, Ex. 1, Attach. B, Administrative Remedy Generalized Retrieval at 2).  The search reflects that Perry filed Administrative Remedy 929020-F1 at the institution on January 29, 2018, requesting a transfer to an air-conditioned RDAP unit.  (Id.)  On February 2, 2018, the institution denied Administrative Remedy 929020-F1.  (SMF ¶ 10).

On February 22, 2018, Perry appealed Administrative Remedy 929020-R2 to the Regional Office.  (SMF ¶ 11).  The Regional Office rejected the appeal because Perry failed to sign it.  (SMF ¶ 11; Doc. 16, Ex. 1, Knepper Decl. ¶ 7; Doc. 16, Ex. 1, Attach. B, Administrative Remedy Generalized Retrieval at 2-3).  The rejection

---

[4] Perry provides no response to ¶¶ 1-14, 17-26, 28-30, 32-34, 36, 38, 40, 42-48, 50-53, 56-57, 60 of defendants' statement of material facts.  (See Doc. 20, Counterstatement of Material Facts).  Therefore, as authorized by Local Rule 56.1, the court will admit as uncontroverted these statements of facts submitted by defendants.  See Local Rule 56.1 ("All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.").  With respect to ¶¶ 15-16, 27, 31, 35, 37, 39, 41, 49, 54-55, 58-59, 61-63 of defendants' statement of material facts, Perry neither admits nor denies the statements, but instead provides comments to the statements.  (See id.)  To the extent that Perry's fact statements  correspond to defendants' fact statements, the court cites to both statements of facts.  (Docs. 15, 20).

notice informed Perry that he could resubmit Administrative Remedy 929020-R2 in proper form within ten days.  (SMF ¶ 12).

On March 5, 2018, Perry resubmitted his appeal, designated as Administrative Remedy 929020-R3.  (SMF ¶ 13; Doc. 16, Ex. 1, Knepper Decl. ¶ 7; Doc. 16, Ex.1, Attach. B, Administrative Remedy Generalized Retrieval at 3).  On April 4, 2018, the Regional Director denied Administrative Remedy 929020-R3.  (SMF ¶ 14).  Defendants contend that Perry did not appeal to the Central Office or file any other administrative remedies concerning his request for transfer to an air-conditioned RDAP after the April 4, 2018 denial.  (SMF ¶ 15).  Perry indicates that he filed an appeal to the Central Office on June 19, 2018.  (Doc. 20 ¶ 1).

Perry filed the instant action on April 23, 2018.  (SMF ¶ 16; Doc. 1).  Perry admits that he did not exhaust his administrative remedies.  (SMF ¶ 16; Doc. 1 ¶¶ 8-9; Doc. 1 at 10-11; Doc. 20 ¶ 2).  Perry claims that exhaustion would be futile, and exhaustion is not required because his claim involves statutory construction.  (Id.)

**B.**     **Residential Drug Abuse Treatment Program**

The BOP offers several drug treatment programs, including drug abuse education, non-residential drug abuse treatment services, and the Residential Drug Abuse Program.  (SMF ¶ 17; Doc. 16, Ex. 2, Declaration of Heather Ramirez, Psy.D. ("Ramirez Decl."), ¶ 4).  Heather Ramirez, Psy.D., has been the Drug Abuse Program Coordinator at the United States Penitentiary in Lewisburg, Pennsylvania ("USP-Lewisburg") since 2003.  (SMF ¶ 18; Ramirez Decl. ¶¶ 1, 4).  In that capacity, she is responsible for overseeing RDAP at USP-Lewisburg.  (Id.)

The RDAP is a treatment program that targets inmates who volunteer for treatment for a diagnosable and verifiable substance abuse disorder.  (SMF ¶ 19; Ramirez Decl. ¶ 4; Doc. 16, Ex. 3, Excerpt from Program Statement 5330.11, Psychology Treatment Programs).  Inmates participating in RDAP must complete a unit-based component, which is a course of activities provided in a treatment unit set apart from the general prison population.  (SMF ¶ 20).  Once inmates complete the unit-based component of RDAP, inmates must then complete a community component.  (SMF ¶ 21).  Inmates who successfully complete all portions of the RDAP are eligible to receive up to one year off their federal sentence.  (SMF ¶ 22).

In order to be eligible for the RDAP, BOP policy states that an inmate must have a verifiable substance use disorder, sign an agreement acknowledging program responsibility, and be able to complete all components of the program. (SMF ¶ 23; Doc. 16, Ex. 3, Excerpt from Program Statement 5330.11, Psychology Treatment Programs).  A Drug Abuse Program Coordinator, such as Dr. Ramirez, decides whether to place inmates in RDAP based on the eligibility requirements stated in BOP policy, by conducting a clinical interview with the inmate.  (SMF ¶ 24).

Perry has applied to participate in RDAP.  (SMF ¶ 25; Doc. 16, Ex. 2, Ramirez Decl. ¶ 5).  However, Perry has never been determined eligible for RDAP.  (Id.)  On September 22, 2017 and November 29, 2017, Dr. Ramirez attempted to interview Perry.  (SMF ¶ 26).  During both meetings, Perry stated that he was only interested in RDAP if he had assurances he would be transferred to another institution to

complete the program, claiming he must be housed in an air-conditioned environment for medical reasons. (SMF ¶ 27; Doc. 20 ¶ 3).

The classroom portions of Lewisburg's RDAP are conducted in an air-conditioned setting. (SMF ¶ 28; Doc. 20 ¶ 3). The living quarters for those participating in the RDAP at Lewisburg are not air-conditioned. (Id.) Perry completed Drug Abuse Education at USP-Lewisburg; however, because he unilaterally imposed a requirement of air-conditioned housing for the RDAP, Perry has never been found to be eligible to participate in the RDAP. (SMF ¶ 29; Doc. 16, Ex. 2, Ramirez Decl. ¶ 6; Doc. 16, Ex. 2, Attach. A, Inmate History, Drug Programs).

**C.     Medical Treatment**

Perry entered federal custody with various diagnoses, including cardiomyopathy and congestive heart failure. (SMF ¶ 30; Doc. 16, Ex. 4, Declaration of Andrew Edinger, M.D. ("Edinger Decl."), ¶ 4; Doc. 16, Ex. 4, Attach. A, Cardiac Medical Record Excerpts at 1-4). Prior to his incarceration, an internal defibrillator was suggested. (SMF ¶ 31; Doc. 20 ¶ 4). However, Perry declined the procedure and chose to pursue a medication regimen instead. (Id.) Prior to his incarceration, testing showed that Perry's ejection fraction (the percentage of blood leaving the heart each time it contracts) was 40%, with a normal range generally being between 55-60%. (SMF ¶ 32).

On March 15, 2016, Health Services staff decided to continue Perry on a medication regimen, scheduled him for chronic care visits, and advised him to notify Health Services immediately if he experienced any symptoms. (SMF ¶ 33).

Additionally, medical staff submitted a request for prior medical records. (Id.)
Health Services staff did not receive a response to the request for prior records.
(SMF ¶ 34; Doc. 16, Ex. 4, Edinger Decl. ¶ 5; Doc. 16, Ex. 4, Attach. A, Cardiac
Medical Record Excerpts at 5-6). Therefore, the staff ordered a new
echocardiogram to determine Perry's current ejection fraction. (Id.)

On May 24, 2016, a new echocardiogram was performed. (SMF ¶ 35; Doc. 16,
Ex. 4, Edinger Decl. ¶ 5; Doc. 16, Ex.4, Attach. A, Cardiac Medical Record Excerpts
at 7-9). Due to Perry's inability to tolerate probe pressure, the findings were
suboptimal. (Id.) The testing indicated an improved ejection fraction of about 50%,
but Perry reported feeling very low energy. (SMF ¶ 36; Doc. 16, Ex. 4, Edinger Decl.
¶ 5; Doc. 16, Ex. 4, Attach. A, Cardiac Medical Record Excerpts at 10-14). Therefore,
a sleep study and consult with cardiology were ordered. (Id.) The sleep study
indicated a diagnosis of sleep apnea. (SMF ¶ 37; Doc. 20 ¶ 6). To treat his sleep
apnea, Perry was provided a continuous positive airway pressure ("CPAP")
machine. (Id.)

On November 29, 2016, Perry was treated by cardiologist Donald Nardone,
M.D., who recommended a 48-hour Holter monitor and a new echocardiogram.
(SMF ¶ 38; Doc. 16, Ex. 4, Edinger Decl. ¶ 6; Doc. 16, Ex. 4, Attach. A, Cardiac
Medical Record Excerpts at 15-23). The tests revealed an ejection fraction of 40-
45% and no rhythm irregularities. (SMF ¶ 39; Doc. 16, Ex. 4, Edinger Decl. ¶ 6; Doc.
16, ex. 4, Attach. A, Cardiac Medical Record Excerpts at 28-30; Doc. 20 ¶ 7). On
January 31, 2017, Dr. Nardone conducted a follow-up examination. (SMF ¶ 40; Doc.

16, Ex. 4, Edinger Decl. ¶ 7; Doc. 16, Ex. 4, Attach. A, Cardiac Medical Record Excerpts at 24-30). Dr. Nardone continued Perry on a medication regimen and noted that the Holter monitor did not show any irregularities. (Id.) Dr. Nardone requested a follow-up visit in ten weeks. (Id.)

On February 17, 2017, Health Services staff treated Perry. (SMF ¶ 41; Doc. 16, Ex. 4, Edinger Decl. ¶ 8; Doc. 16, Ex. 4, Attach. A, Cardiac Medical Record Excerpts at 31-35; Doc. 20 ¶ 8). The staff noted that Perry appeared to be doing well on his current medication regimen with no complaints. (Id.)

On April 17, 2017, Dr. Nardone again evaluated Perry. (SMF ¶ 42; Doc. 16, Ex. 4, Edinger Decl. ¶ 8; Doc. 16, Ex. 4, Attach. A, Cardiac Medical Record Excerpts at 36-41). Dr. Perry did not note any changes, other than a recommendation to continue exercise and weight loss, with a follow-up in ten weeks. (Id.)

On April 19, 2017, Health Services staff treated Perry. (SMF ¶ 43; Doc. 16, Ex. 4, Edinger Decl. ¶ 9; Attach. A, Cardiac Medical Record Excerpts at 42-43). Perry reported that he was not using his CPAP machine because he could not obtain distilled water. (Id.) At this visit, no changes were made to Perry's medication regimen, and Health Services staff advised him he only needed to use water with his CPAP machine if he experienced dryness, otherwise he could use tap water. (SMF ¶ 44).

During a June 22, 2017 office visit with Dr. Nardone, Perry self-reported difficulty breathing when sleeping in a hot and humid environment, but that it improved when the air-conditioning was on. (SMF ¶ 45; Doc. 16, Ex. 4, Edinger

Decl. ¶ 10; Doc. 16, Ex. 4, Attach. A, Cardiac Medical Record Excerpts at 44-54). As a result, Dr. Nardone recommended that Perry be housed in an air-conditioned environment. (Id.) Also on June 22, 2017, Dr. Nardone started Perry on a new medication, which Health Services approved, and advised him to follow-up in three months. (SMF ¶ 46).

Perry was and is presently housed in an air-conditioned environment at FPC-Lewisburg. (SMF ¶ 47).

On July 28, 2017, Health Services staff treated Perry. (SMF ¶ 48; Doc. 16, Ex. 4, Edinger Decl. ¶ 11; Doc. 16, Ex. 4, Attach. A, Cardiac Medical Record Excerpts at 55-56). Perry mentioned Dr. Nardone's recommendation for air-conditioned housing and stated that he did not feel he could participate in USP-Lewisburg's voluntary RDAP program because the living quarters of the RDAP at Lewisburg are not air-conditioned. (Id.) At this July 28, 2017 visit, Health Services staff advised Perry that exacerbation of his cardiac issues was unlikely to occur exclusively due to heat and humidity and Perry indicated a fan blowing on his face at night helped him feel better. (SMF ¶ 49; Doc. 20 ¶ 9).

On September 28, 2017, Dr. Nardone treated Perry. (SMF ¶ 50; Doc. 16, Ex. 4, Edinger Decl. ¶ 12; Doc. 16, Ex. 4, Attach. A, Cardiac Medical Record Excerpts at 57-62). Perry reported fatigue and being symptomatic in hot and humid weather. (Id.) Dr. Nardone advised Perry to continue his current medication regimen and follow-up again in three months, and again recommend air-conditioned housing. (SMF ¶ 51).

On December 21, 2017, Dr. Nardone again treated Perry. (SMF ¶ 52; Doc. 16, Ex. 4, Edinger Decl. ¶ 13; Doc. 16, Ex. 4, Attach. A, Cardiac Medical Record Excerpts at 63-68). Dr. Perry changed the dosage of some medications and recommended a follow-up examination in three months. (Id.)

During a December 22, 2017, Health Services visit, Perry again expressed his desire for transfer to an RDAP facility with air conditioning. (SMF ¶ 53; Doc. 16, Ex. 4, Edinger Decl. ¶ 14; Doc. 16, Ex. 4, Attach. A, Cardiac Medical Record Excerpts at 69-70). Health Services staff informed Perry that if he truly required air-conditioning due to cardiac issues, it would be inconsistent to allow any housing other than full-time, fully climate-controlled housing, which would require designation to a medical facility. (SMF ¶ 54; Doc. 20 ¶ 10). Perry did not wish to pursue that designation. (Id.)

Defendant Edinger and the physician who saw Perry on December 22, 2017, discussed Perry's transfer request and agreed Perry had not demonstrated medical intolerance to warm weather conditions while at Lewisburg. (SMF ¶ 55). A follow-up echocardiogram was ordered. (Id.) Perry maintains that he has intolerance to heat. (Doc. 20 ¶ 11).

On January 16, 2018, Health Services staff treated Perry and he again expressed his RDAP concerns. (SMF ¶ 56; Doc. 16, Ex. 4, Edinger Decl. ¶ 15; Doc. 16, Ex. 4, Attach. A, Cardiac Medical Record Excerpts at 71-74).

On January 23, 2018, Health Services staff treated Perry. (SMF ¶ 57; Ex. 4, Edinger Decl. ¶ 15; Attach. A, Cardiac Medical Record Excerpts at 75-76). Perry

reported a "pinchy" feeling in his chest and stated he was told to notify medical of these symptoms so they could be documented to support his contention that heat and humidity exacerbated his congestive heart failure. (Id.) At this visit, Health Services staff noted that the temperature was 50 degrees and raining, that the assessment yielded no abnormal findings, and that Perry became frustrated and upset. (SMF ¶ 58; Doc. 20 ¶ 12).

On March 19, 2018, an echocardiogram showed an increased ejection fraction of 55-60%, which is normal range for an adult. (SMF ¶ 59; Doc. 16, Ex. 4, Edinger Decl. ¶ 16; Doc. 16, Ex. 4, Attach. A, Cardiac Medical Record Excerpts at 77-80). Perry indicates that he is housed in an air-conditioned unit and is responding to the medication regimen. (Doc. 20 ¶ 13). He thus states that the treatment plan recommended by Dr. Nardone is appropriate. (Id.)

On March 19, 2018, Dr. Nardone treated Perry. (SMF ¶ 60; Doc. 16, Ex. 4, Edinger Decl. ¶ 17; Doc. 16, Ex. 4, Attach. A, Cardiac Medical Record Excerpts at 81-88). Dr. Nardone noted that Perry was well-controlled on medical therapy and noted that the current regimen would continue. (Id.) Dr. Perry encouraged Perry to get more exercise and to follow-up in three months. (Id.)

During a June 11, 2018 visit with Dr. Nardone, Perry's condition remained stable. (SMF ¶ 61; Doc. 16, Ex. 4, Edinger Decl. ¶ 18; Doc. 16, Ex. 4, Attach. A, Cardiac Medical Record Excerpts at 95; Doc. 20 ¶ 14). Dr. Nardone continued the current regimen and ordered a follow-up in six months. (Id.)

Dr. Edinger declares that Perry appears to be doing well on his medication regimen, testing reveals his heart is functioning roughly the same as a normal adult, his cardiomyopathy is currently well-controlled and there is no reason to believe that living in an environment without air-conditioning would affect his condition. (SMF ¶ 62; Doc. 16, Ex. 4, Edinger Decl. ¶ 19). Dr. Edinger declares that an air-conditioned living environment is a matter of personal preference to Perry and is not medically necessary. (SMF ¶ 63). Perry contends that Dr. Edinger's opinion contradicts Dr. Nardone's recommendation. (Doc. 20 ¶¶ 15-16).

## III.  Discussion

### A.  Exhaustion of Administrative Review

Defendants argue that Perry failed to properly exhaust his administrative remedies prior to filing the instant action. (Doc. 16 at 17-19). Under the Prison Litigation Reform Act of 1996 (the "PLRA"), a prisoner is required to pursue all avenues of relief available within the prison's grievance system before bringing a federal civil rights action concerning prison conditions. See 42 U.S.C. § 1997e(a); Booth v. Churner, 206 F.3d 289, 291 (3d Cir. 2000). Section 1997e(a) establishes the requirement of administrative exhaustion:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). Perry's Bivens claim falls within the ambit of the PLRA. See Nyhuis v. Reno, 204 F.3d 65, 68 (3d Cir. 2000) ("[Section] 1997e(a) applies equally to § 1983 actions and to Bivens actions.").

The PLRA "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002). It has been made clear that the exhaustion requirement is mandatory. See Williams v. Beard, 482 F.3d 637, 639 (3d Cir. 2007); see also Booth v. Churner, 532 U.S. 731, 741 (2001) (holding that the exhaustion requirement of the PLRA applies to grievance procedures "regardless of the relief offered through administrative procedures"); Nyhuis, 204 F.3d at 67 (same). "[I]t is beyond the power of [any] court . . . to excuse compliance with the exhaustion requirement." Nyhuis, 204 F.3d at 73 (quoting Beeson v. Fishkill Corr. Facility, 28 F. Supp.2d 884, 894-95 (S.D.N.Y. 1998)).

To exhaust administrative remedies an inmate must comply with all applicable grievance procedures and rules. Spruill v. Gillis, 372 F.3d 218, 231 (3d Cir. 2004). The PLRA requires not only technical exhaustion of the administrative remedies, but also substantial compliance with procedural requirements. Spruill, 372 F.3d at 227-32; see also Nyhuis, 204 F.3d at 77-78. A procedural default by the prisoner, either through late or improper filings, bars the prisoner from bringing a claim in federal court unless equitable considerations warrant review of the claim. Spruill, 372 F.3d at 227-32; see also Camp v. Brennan, 219 F.3d 279 (3d Cir. 2000).

For federal prisoners, such as Perry, the BOP has an administrative remedy procedure setting forth the necessary steps to exhaust a grievance pursuant to § 1997e(a). 28 C.F.R. § 542.10(a). Specifically, the BOP has a three-level administrative process through which an inmate can address issues concerning the

conditions of his confinement.  See id.  An inmate must first informally present his complaint to staff, and staff is to attempt to resolve the matter.  28 C.F.R. § 542.13(a). If the informal resolution is unsuccessful, then the inmate must execute the appropriate form to bring the matter to the attention of the warden, within twenty calendar days of the date of the incident.  28 C.F.R. § 542.14(a).  If the inmate is dissatisfied with the warden's response, he may then appeal to the Regional Director within twenty calendar days.  28 C.F.R. § 542.15(a).  The inmate may then appeal to the BOP's Central Office within thirty calendar days, which office is the final administrative appeal level in the BOP.  Id.  No administrative appeal is considered to have been fully exhausted until considered by the BOP's General Counsel.  28 C.F.R. § 542.15(a).  If an administrative remedy is rejected for a procedural deficiency, the remedy is returned to the inmate and the BOP provides the inmate with a written notice explaining the reason for the rejection.  28 C.F.R. § 541.17(b).

In the ordinary course of business, computerized indices are kept of requests for administrative review filed by inmates.  A search of BOP records was conducted to determine whether Perry exhausted the administrative process with respect to the claims in his complaint.  (Doc. 16, Ex. 1, Attach. B, Administrative Remedy Generalized Retrieval ("BOP Retrieval")).  This review revealed that Perry filed one administrative remedy requesting a transfer to an air-conditioned unit.  (Id.)  On January 29, 2018, Perry filed Administrative Remedy 929020-F1 at the institution requesting a transfer to an air-conditioned unit.  (SMF ¶ 9).  On February 2, 2018, the institution denied Administrative Remedy 929020-F1.  (Id. at ¶ 10).  On March 5,

2018, Perry appealed to the Regional Office, designated as Administrative Remedy 929020-R3.  (Id. at ¶ 13).  On April 4, 2018, the Regional Director denied Administrative Remedy 929020-R3.  (Id. at ¶ 14).  At this point, rather than pursue administrative review with the Central Office, Perry filed the instant action.

Perry admits that he did not exhaust his administrative remedies prior to filing the instant action.  (Doc. 1 at 10-11; Doc. 20 at 4, 11).  Instead, he argues that he should be excused from the exhaustion requirement because it would be futile, and because his claim involves statutory construction.  (Id.)

Exhaustion of administrative remedies is not rendered futile simply because a prisoner anticipates he will be unsuccessful in his administrative appeals.  Nyhuis, 204 F.3d at 71 (stating that there is no futility exception to the exhaustion requirement under any circumstances); Romero v. Meeks, No. 14-11, 2014 WL 4796579, *5 (W.D. Pa. Sept. 26, 2014) (quoting Amirnazmi v. Scism, No. 3:11-CV-273, 2011 WL 5854579, *6-7 (M.D. Pa. Nov. 21, 2011) ("Petitioner's argument that exhaustion would be futile or cause irreparable injury also fails. Courts in this District have repeatedly held that exhaustion of administrative remedies is not rendered futile simply because a prisoner anticipates that he will be unsuccessful in his administrative appeals before" the date he believes he should be released to a halfway house) (citations and internal quotations omitted)).  As noted by the United States Court of Appeals for the Third Circuit, when examining discretionary prison decisions regarding RRC placement, exhaustion is required before a prisoner may proceed into federal court.  See Vasquez v. Strada, 684 F.3d 431, 434 (3d Cir. 2012); see also Bisulca v. Schism, No. 09-2552, 2010 WL 1805394 (M.D. Pa. May 5, 2010);

McCooey v. Martinez, No. 09-1533, 2010 WL 411744 (M.D. Pa. Jan. 25, 2010). The record reflects that Perry filed this lawsuit before submitting an appeal of the Regional Director's denial of Administrative Remedy 929020-R3 to the Central Office. Perry has failed to submit any evidence that would permit the court to find that exhaustion would have been futile.

Perry next contends that his failure to exhaust should be excused because his claim involves statutory construction. (Doc. 20 at 4). Perry broadly contends that the issue presented involves statutory construction and is question of law. (See id.) However, he fails to set forth any argument in support of this contention. Moreover, the relevant case law does not indicate that the issue before the court— which requests the court to compel defendants to immediately transfer Perry to an air-conditioned RDAP housing area—is a question of law. See, e.g., Vasquez, 684 F.3d at 433-34 ("We have held that a prisoner need not exhaust administrative remedies where the issue presented involves only statutory construction . . . but [the petitioner] asked the District Court to direct the BOP to provide him with the maximum 12-month RRC placement. Contrary to his assertion in the proceedings below, he was not merely challenging the construction of the Second Chance Act, or the BOP's implementation of the Federal prisoner reentry initiative. Exhaustion was required in his case, and [the petitioner's] habeas corpus petition properly was dismissed for failing to exhaust administrative remedies.").

The law is clear that Perry was required to exhaust his administrative remedies before he filed the instant action with respect to all of his claims. Booth, 532 U.S. at 739; Woodford v. Ngo, 548 U.S. 81, 92 (2006) (mandating complete

exhaustion of all administrative remedies before filing suit); see also Rivera v. Pa. Dep't of Corr., 388 F. App'x 107, 108 (3d Cir. 2010) ("An inmate must exhaust his administrative remedies prior to filing a civil action in federal court"). The law is also clear that Perry could not complete exhaustion while his present action was pending with this court. The Third Circuit stated that "there appears to be unanimous circuit court consensus that a prisoner may not fulfill the PLRA's exhaustion requirement by exhausting administrative remedies after the filing of the complaint in federal court." Oriakhi v. United States, 165 F. App'x 991, 993 (3d Cir. 2006) (not precedential). The Oriakhi Court found that the lower court had properly dismissed plaintiff's complaint because his exhaustion attempt took place after he filed his Bivens claim. "[T]he district court must look to the time of filing, not the time the district court is rendering its decision, to determine if exhaustion has occurred." Oriakhi, 165 F. App'x at 993 (quoting Johnson v. Jones, 340 F.3d 624, 627-28 (8th Cir. 2003)).

The record reflects that Perry failed to exhaust administrative remedies before initiating the instant action. The court concludes that Perry has not exhausted his administrative remedies and has not shown that his failure to pursue such administrative relief should be excused. Thus, as a threshold matter, Perry's claims fail on administrative exhaustion grounds. Beyond this threshold concern, there are separate, and independent, substantive flaws with Perry's claims against the defendants. These deficiencies are discussed below.

## B.    Lack of Personal Involvement

Defendants argue that Perry fails to state a claim against them because they lack personal involvement in the alleged wrongs, and because the allegations against them are based solely on the doctrine of *respondeat superior*.  (Doc. 16 at 19-22).  The court agrees.

Individual liability can be imposed under section 1983 only if the state actor played an "affirmative part" in the alleged misconduct and "cannot be predicated solely on the operation of respondeat superior."  Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005) (quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1998)). "A defendant in a civil rights action must have personal involvement in the alleged wrongs. . . .  Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence."  Rode, 845 F.2d at 1207-08; see also Rizzo v. Goode, 423 U.S. 362 (1976); Atkinson v. Taylor, 316 F.3d 257 (3d Cir. 2003).  Such allegations, however, must be made with appropriate particularity in that a complaint must allege the particulars of conduct, time, place, and person responsible.  Evancho, 423 F.3d at 354; Rode, 845 F.2d at 1207-08.  Alleging a mere hypothesis that an individual defendant had personal knowledge or involvement in depriving the plaintiff of his rights is insufficient to establish personal involvement. Rode, 845 F.2d at 1208.

Aside from naming Warden Ebbert as a defendant, the complaint contains no allegations against him.  (See Doc. 1).  With respect to Dr. Edinger, Perry only states that he was at a meeting and discussed the possibility of increasing Perry's care level to that of a medical facility.  (See id. at 3-4).  The complaint is devoid of any

18

allegations establishing the personal involvement of these defendants. It appears that Perry attempts to hold the defendants liable based on their supervisory roles. However, it is well-established that officials may not be held liable for unconstitutional conduct of their subordinates under a theory of *respondeat superior*. See Rode, 845 F.2d at 1207. Accordingly, defendants are entitled to judgment in their favor to the extent that Perry's deliberate indifference claim relies on a *respondeat superior* theory of liability.

Additionally, for purposes of Eighth Amendment medical claims, nonmedical staff may not be "considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor." Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993). The rationale for this rule has been aptly explained by the United States Court of Appeals for the Third Circuit as follows:

> If a prisoner is under the care of medical experts . . . , a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison. Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor. Moreover, under such a regime, nonmedical officials could even have a perverse incentive not to delegate treatment responsibility to the very physicians most likely to be able to help prisoners, for fear of vicarious liability. Accordingly, we conclude that, absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference.

Spruill, 372 F.3d at 236. Courts have repeatedly held that, absent some reason to believe that prison medical staff are mistreating prisoners, non-medical corrections staff who refer inmate medical complaints to physicians may not be held personally liable for medically-based Eighth Amendment claims. See, e.g., id. at 236-37 (citing Durmer, 991 F.2d at 69); Garvey v. Martinez, No. 08- 2217, 2010 WL 569852, at *6-7 (M.D. Pa. 2010); Hodge v. United States, No. 06-1622, 2007 WL 2571938, at *5-6 (M.D. Pa. 2007). Moreover, a claim of a constitutional deprivation cannot be premised merely on the fact that the named defendant was the prison warden, or a prison supervisor, when the incidents set forth in the complaint occurred. See Rode, 845 F.2d at 1207.

With respect to the nonmedical defendant, Ebbert, Perry fails to establish a viable claim. Defendant Ebbert is the warden of USP-Lewisburg and is not a trained member of the medical staff subject to liability for an Eighth Amendment claim. Moreover, as stated, a review of the complaint confirms that there are no specific assertions that defendant Ebbert had any personal involvement in the purported violations of Perry's rights under the Eighth Amendment. (See generally Doc. 1). Perry has not presented any evidence that defendant Ebbert provided him with medical care, refused to provide medical care, or prevented him from receiving medical care; nor has Perry presented any evidence that defendant Ebbert was aware of or acquiesced in purported Eighth Amendment violations. Because Perry was under the regular care of medical experts, the nonmedical defendant was justified in believing that Perry was in capable hands. See Spruill, 372 F.3d at 236; Durmer, 991 F.2d at 69.

To the extent that Perry attempts to hold the defendants liable based on their involvement in the grievance procedure, this claim also fails. Inmates do not have a constitutional right to prison grievance procedures. Lions v. Wetzel, No. 1:13-cv-2952, 2015 WL 2131572, at *6 (M.D. Pa. May 6, 2015). The filing of a grievance, participation in "after-the-fact" review of a grievance, or dissatisfaction with the response to an inmate's grievance, do not establish the involvement of officials and administrators in any underlying constitutional deprivation. See Rode, 845 F.2d 1195, 1207 (3d Cir. 1998) (supervisory liability where a defendant, after being informed of the violation through the filing of grievances, reports or appeals, failed to take action to remedy the alleged wrong is not enough to show that the defendant has the necessary personal involvement); Pressley v. Beard, 266 F. App'x 216, 218 (3d Cir. 2008) (not precedential) ("The District Court properly dismissed these defendants and any additional defendants who were sued based on their failure to take corrective action when grievances or investigations were referred to them."); Brooks v. Beard, 167 F. App'x 923, 925 (3d Cir. 2006) (not precedential) (holding that allegations that prison officials responded inappropriately to inmate's later-filed grievances do not establish the involvement of those officials and administrators in the underlying constitutional deprivation). Thus, any attempt to establish liability against defendants based upon their involvement in of the grievance process does not support a constitutional claim. See Alexander v. Gennarini, 144 F. App'x 924, 925 (3d Cir. 2005) (involvement in post-incident grievance process not a basis for liability).

For all the foregoing reasons, the court will grant defendants' motion.

### C. Constitutional Claims

#### 1. *Deliberate Indifference Claim*

The Eighth Amendment's proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care.  See Estelle v. Gamble, 429 U.S. 97, 103-05 (1976).  In order to establish an Eighth Amendment medical claim, a plaintiff "must show (i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need."  Natale v. Camden Cty. Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003) (citing Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999)).  A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would recognize the necessity for a doctor's attention." Monmouth Cty. Corr. Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987).  In addition, "if 'unnecessary and wanton infliction of pain' results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the eighth amendment."  Id. (citation omitted).

A prison official acts with deliberate indifference to an inmate's serious medical needs when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  A mere difference of opinion between the prison's medical staff and the inmate regarding the diagnosis or treatment which the inmate receives does not support a claim of cruel and

unusual punishment.  See Farmer v. Carlson, 685 F. Supp. 1335, 1339 (M.D. Pa. 1988); see also McCracken v. Jones, 562 F.2d 22, 24 (10th Cir. 1977); Smart v. Villar, 547 F.2d 112, 113 (10th Cir. 1976), cert. denied, 450 U.S. 1041 (1981).

In the instant action, the court finds that Perry's cardiomyopathy, congestive heart failure, and sleep apnea rise to the level of serious medical conditions for purposes of the Eighth Amendment analysis.  The court must determine whether Perry has established a deliberate indifference to those needs.

The record reflects that Perry received regular medical treatment by staff at USP-Lewisburg and by outside medical providers for his ailments.  (SMF ¶¶ 30-61).  Perry visited the health services department on numerous occasions, he underwent a sleep study, three echocardiograms, a 48-hour Holter monitor test, and underwent several blood tests.  Perry treated with an outside cardiologist, Dr. Nardone, on eight occasions.  (Id. ¶¶ 30-63).  He uses a CPAP machine for sleep apnea, and he is prescribed medications as coordinated by Dr. Nardone and BOP Health Services.  (Id. ¶¶ 30-63).  Furthermore, it is undisputed that Perry is currently housed in an air-conditioned unit, as recommended by the cardiologist.  (Id. at ¶ 47).

The court finds that defendants were not deliberately indifferent to Perry's medical needs.  There is no evidence that defendants wholly refused to provide any medical care.  Indeed, Perry admits that he received medical treatment at USP-Lewisburg and from outside medical providers.  Perry essentially expresses that he is dissatisfied with the medical care he received and dissatisfied with the inability to live in an air-conditioned RDAP housing unit at USP-Lewisburg.  However, the Third Circuit has repeatedly held that disagreements as to the proper course of

medical treatment simply do not suffice to satisfy the deliberate indifference standard. See Spruill, 372 F.3d at 235 (citing Monmouth Cty., 834 F.2d at 346); see also Norris v. Frame, 585 F.2d 1183, 1186 (3d Cir. 1978) ("Where the plaintiff has received some care, inadequacy or impropriety of the care that was given will not support an Eighth Amendment claim."); Carpenter v. Kloptoski, No. 08-2233, 2012 WL 983565, at *6 (M.D. Pa. 2012) (citing White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990)) (observing that "a prisoner's subjective dissatisfaction with his medical care does not in itself indicate deliberate indifference"). Moreover, courts will not second guess whether a particular course of treatment is adequate or proper. See Parham v. Johnson, 126 F.3d 454, 458 n.7 (3d Cir. 1997) (quoting Inmates of Allegheny Cty. Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979)). There is nothing in the record to demonstrate that defendants acted with deliberate indifference with respect to Perry's medical needs, or that defendants improperly denied him treatment. Thus, Perry failed to establish an Eighth Amendment deliberate indifference claim and defendants' motion will be granted in this regard.

### 2. *Due Process Claim*

The RDAP at FPC-Lewisburg has living quarters that are not air-conditioned. (SMF ¶¶ 17-29). Perry seeks a transfer to another institution with air-conditioned living quarters in order to participate in the voluntary RDAP program. An inmate does not have a liberty interest in assignment to a particular institution or security classification, so long as the conditions and degree of the inmate's confinement fall within the sentence imposed and do not otherwise violate the

Constitution.  See Olim v. Wakinekona, 461 U.S. 238, 245 (1983); Meachum v. Fano, 427 U.S. 215, 224-25 (1976).

Additionally, it is well-settled that "inmates do not have a protected liberty interest in either RDAP participation or in the associated early release benefit." Reeb v. Thomas, 636 F.3d 1224, 1129 n. 4 (9th Cir. 2011), citing Greenholtz v. Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1, 7, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) (determining that a prisoner does not have a constitutional right to be released prior to the expiration of a valid sentence).  See also Royal v. Scibana, 309 F. App'x 284, 286 (10th Cir. 2009) ("We have held that a prisoner does not possess a constitutional right to a reduction of a valid sentence, and that § 3621(e)(2)(B) does not confer upon a prisoner a constitutionally-protected liberty interest") (citation omitted); Carey v. Warden, FCI Allenwood-Low, No. 1:17-CV-00500, 2017 WL 2288857, at *2 (M.D. Pa. May 25, 2017) ("However, while eligibility for early release under § 3621(e)(2)(B) is open to all prisoners who meet the statutory requirements, the statute expressly vests the BOP with broad discretion to grant or deny sentence reductions to eligible prisoners.") (citing 18 U.S.C. § 3621(e)(2)(B)); Parsons v. Quintana, 2010 WL 324005, at *7 (W.D. Pa. Jan. 20, 2010) (inmate has no liberty interest in a sentence reduction under § 3621(e)(2)(B)).

Because Perry does not have a protected liberty interest in assignment to a particular institution, and does not have a protected liberty interest in RDAP participation or its associated early release benefit, he cannot support a claim based upon a violation of his procedural due process rights, and summary judgment will be entered in favor of defendants with regard to such claim.

25

## IV.    Federal Rule of Civil Procedure 4(m)

Rule 4(m) sets forth the following time frame a plaintiff has to serve a

defendant with the summons and copy of the complaint:

> If a defendant is not served within 90 days after the complaint is filed,
> the court -- on motion or on its own after notice to the plaintiff -- must
> dismiss the action without prejudice against that defendant or order
> that service be made within a specified time. But if the plaintiff shows
> good cause for the failure, the court must extend the time for service
> for an appropriate period.

FED. R. CIV. P. 4(m).

Defendant Christopher Lee was named in the complaint that was filed on

April 23, 2018 and, to date, has not been served in this case.  The court must engage

in a two-step process in determining whether to dismiss the non-served defendant

or grant Perry additional time to effect service.  "First, the district court should

determine whether good cause exists for an extension of time.  If good cause is

present, the district court must extend time for service and the inquiry is ended.  If,

however, good cause does not exist, the court may in its discretion decide whether

to dismiss the case without prejudice or extend time for service."  Petrucelli v.

Bohringer & Ratzinger, 46 F.3d 1298, 1305 (3d Cir. 1995).  Good cause requires good

faith on the part of the party seeking an enlargement and some reasonable basis for

noncompliance with the time specified in the rules.  MCI Telecomm. Corp. v.

Teleconcepts, Inc., 71 F.3d 1086, 1097 (3d Cir. 1995).  In determining whether good

cause exists, a court's "primary focus is on the plaintiff's reasons for not complying

with the time limit in the first place."  Id.  Although prejudice is a factor to be

considered, the absence of prejudice to the opposing party alone does not constitute good cause to excuse late service.  Id.

In the present matter, Perry has failed to establish good cause.  Perry's *pro se* status does not excuse his failure to identify and to timely serve this defendant.  Veal v. United States, 84 F. App'x 253, 256 (3d Cir. 2004).  Additionally, Perry failed to timely request an enlargement of time to serve this defendant.  See McCurdy v. Am. Bd. of Plastic Surgery, 157 F.3d 191, 196 (3d Cir. 1998) (noting that good cause is generally established when a plaintiff moves for an extension of time before the expiration of the 120 days service period).  Thus, the court finds that Perry failed to establish good cause.

If a plaintiff cannot show good cause for his failure to serve the defendant within ninety days, a district court may either dismiss the defendant, or exercise its discretion to order that service be made within a specific time.  Petrucelli, 46 F.3d at 1305; see also FED. R. CIV. P. 4(m).  After the expiration of the ninety-day time period set forth in Rule 4(m), the court notified Perry that the action against defendant Lee was subject to dismissal, and directed him to show cause why the action against this defendant should not be dismissed pursuant to Rule 4(m).  (Doc. 25).  It is Perry's responsibility to properly identify all defendants, and provide accurate mailing addresses for the defendants, in a timely fashion.  (See Doc. 6 ¶ 2) (advising Perry that failure to properly name a defendant, or provide an accurate mailing address for a defendant, may result in dismissal of the claims against that defendant pursuant to Federal Rule of Civil Procedure 4(m)).

Perry has been granted the opportunity to effect proper service and was notified that the non-served defendant was subject to dismissal pursuant to Federal Rule of Civil Procedure 4(m). (Doc. 25). Perry has nevertheless failed to serve this defendant. As a result, the non-served defendant will be dismissed from this action pursuant to Rule 4(m) of the Federal Rules of Civil Procedure, as he has not been served within ninety days of the date on which he was named as a defendant in this action.

## V. <u>Conclusion</u>

For the reasons set forth above, the court will grant defendants' motion (Doc. 11) for summary judgment. The court will also dismiss the action against Christopher Lee pursuant to Federal Rule of Civil Procedure 4(m). An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:      March 29, 2019